## Chicago & Alton Railroad Company v. Anna Sloan Walker.

### Gen. No. 4,447.

1. DEPOT—*obligation of carrier to keep open.*   It is not only the duty
of a railroad company to build and maintain depots for the comfort of
its passengers, but it is likewise its duty to keep the same open for the
reception of passengers for a reasonable time before a train is scheduled
to arrive.

2. DEPOT—*obligation of carrier to keep in safe repair.*   It is the duty
of a railroad company to keep its depots in a safe condition so that pas-
sengers rightfully therein may not be injured.

3. DEPOT—*when passenger rightfully in.*   Notwithstanding one other
than an employee of a railroad company unlocked a depot building of
the railroad company and the plaintiff, a passenger, thereupon entered
therein, she is deemed to have been rightfully in such depot.

4. EVIDENCE—*when party cannot complain of lack of.*   A party on
appeal cannot complain of the lack of evidence which would upon the
trial have been supplied but for his objection.

5. LEADING QUESTIONS—*when proper.*   It is within the discretion of
the trial court to permit leading questions on direct examination to
be answered where a witness appears unfriendly to the party calling
him, or where prior to being called he has told the examining counsel
a different story than that testified to upon the stand.

6. LEADING QUESTIONS—*extent to which court's refusal to permit
answering of, will be reviewed.*   It is only when the discretionary power
of the court in this respect has been abused that the Appellate Court
will reverse.

7. VERDICT—*when not excessive.*   A verdict of $4,000 held not ex-
cessive where it appeared that the plaintiff, as the result of the injury,
suffered great pain, was injured in her foot to such an extent as to pre-
vent walking for the period of five months, and where the injury to her
foot was of so serious a character as probably to be permanent.

Action on the case for personal injuries.    Appeal from the Circuit Court of Grundy County; the Hon. SAMUEL C. STOUGH, Judge, presiding.    Heard in this court at the October term, 1904.    Affirmed.    Opinion filed March 8, 1905.

C. W. BROWN, for appellant.

E. L. CLOVER, for appellee.

MR. PRESIDING JUSTICE FARMER delivered the opinion of the court.

Plaintiff below, appellee here, was on the 8th of May, 1903, injured, as she alleges, by the heel of her shoe being caught in a hole near the door of the depot building of appellant at Braceville, and causing her to fall out of the door on the platform.    She resided at Gardner and on the day she was injured bought a round-trip ticket for Braceville where she went to visit her brother.    On the way to Braceville the conductor took up the part of the ticket good to that place and appellant retained the return portion of the ticket.    It was her purpose and intention to return to Gardner on a train that was due at Braceville at 11:02 P. M.    Shortly before the train was due to arrive, she, accompanied by her brother and two small children, one of them her's, went to the depot.    They found no one there, the station dark and the doors locked.    The train plaintiff wished to take, only stopped at Braceville when it was flagged or when it had passengers to let off there.    Shortly after plaintiff and the parties with her reached the station, the village marshal came.    He had a key with which he unlocked the door of the gent's waiting room and the party passed into it.    Plaintiff's brother had a lantern and the marshal lighted a lantern or lamp that was in the waiting room.    When the train whistled for the station, plaintiff's brother went out first with his lantern to flag the train.    He was followed by the two children, they by the plaintiff and last the marshal.    There was a hole in the floor of the waiting room in front of and near the door, nearly two inches wide and several inches long.    Plaintiff claims her heel caught and hung in this hole causing her to fall out of

the door upon the platform and seriously and permanently injuring her ankle. The jury returned a verdict in her favor for $4,000, upon which the court, after overruling a motion for a new trial, rendered judgment.

The proof showed it was the custom of defendant's agent to close and lock the doors of the depot at 7 P. M. He did not return to it again until 7 A. M. the next day, and it is insisted defendant was not responsible for plaintiff's being in the depot on the occasion of her injury, and that in fact she had no right there; that when she found the doors locked and the station dark she should have remained outside on the platform to await the train. Plaintiff claimed a key was furnished the village marshal for the purpose of opening the station for passengers who wished to take the train she was waiting for. With respect to this question this record presents a rather curious state of affairs. Plaintiff introduced the village marshal as a witness on the trial, and he testified he received the key with which he opened the station from his predecessor in office about the third of May, and that two or three days afterwards he received it from the agent of defendant. Plaintiff's counsel asked the witness what defendant's agent said to him when he gave him the key, what his habit and custom was with reference to passengers waiting at the depot for the 11:02 P. M. train and whether he was in the habit of opening and lighting the station for them before the injury to the plaintiff, and whether he received any compensation from defendant for such services, either in the shape of a pass or otherwise. Defendant's counsel objected to all testimony of this kind and the court sustained the objection. We can see no reason why this was not competent and material evidence. The record shows that after the village marshal had testified to the statement we have above mentioned as to his having received the key, he was, on objection being made by counsel, not permitted to testify to any other fact or circumstance relating to how the key came to be given to him, the purpose it was given to him for, what, if any, instruction he had with reference to it from defendant or

its agent, what he did with it with reference to opening the depot for passengers for the night train, what knowledge defendant had of his so doing if he did unlock the station for passengers, or what compensation, if any, he received for his services, in that regard. Plaintiff also introduced as a witness Mr. Pond who was defendant's agent at the time plaintiff received her injury, but at the time of the trial was not in defendant's service. He testified he was the only person employed by defendant at the station, that there were two waiting-rooms in the building, one at each end with the ticket office between them, that his hours were from 7 A. M. to 7 P. M., and that when he left the station the night plaintiff was injured he locked the doors of the waiting-room as was his usual custom. He testified he did not know whether the village marshal had a key to the waiting-room, that he never had a conversation with him in reference to it, and that no arrangements were made by defendant for passengers waiting for the 11 P. M. train. He further testified that on at least two occasions during his year of service there for defendant he had seen lights in the depot after he had closed and left it dark at night, but made no inquiry as to how they came there. This is the substance of all the testimony relating to the authority of the village marshal to open the waiting-room for plaintiff, and it is insisted that it utterly fails to show any such authority.

We assume defendant had erected its depot in compliance with the duty imposed upon it by law to build and maintain depots for the comfort of passengers and the protection of shippers of freight. This duty is not discharged by the building of the depot simply and keeping its doors locked. The comfort of passengers who go to the station to wait for trains they wish to depart on, is one of the principal objects for which railroad companies are required to build and maintain depots. If, as the evidence shows was true in this case, defendant permitted and invited passengers to alight and depart on this night train, it was its duty under the law to keep its station open for a

reasonable time before the arrival and departure of the train. It had no right to require passengers waiting to take the train, to stand out on the platform until its arrival, as its agent testified it did.

Plaintiff having a first-class ticket, entitling her to board the train at Braceville, went to the station for that purpose. She did not unlock the door, but when some one else did do so, she was justified in assuming she had a right to enter it. She was not responsible for a key to the building being in the possession of the village marshal. The depot was for use by persons waiting to take passage on defendant's trains and it was the duty of defendant to keep it in such repair that it could be used for those purposes with reasonable safety. Although defendant may not have intended that plaintiff or anyone else should enter the building to wait for the night train, yet, if, when she arrived at the depot she had found the door open, we apprehend it could hardly be said it would have been an unauthorized and wrongful act on her part to have entered it. No more do we think it can be said that, when, after her arrival at the depot some one came and opened the door to the waiting room, she should not have entered it until she had investigated and determined whether the person who opened the door represented the defendant or had authority from it to do so. It was the duty of defendant to provide a place for the uses plaintiff made of the waiting-room and it was her lawful right to use it for that purpose. So far as we can see from the evidence, plaintiff did no wrongful or unauthorized act and was in nowise responsible for the conditions that caused her injury. Defendant was responsible for the existence of the hole in the floor that caused plaintiff to fall and to that extent its conduct was culpable. If the condition of the room was such that for that reason it was not intended to allow passengers the use of it for the night train, it should have seen to it that it was not opened. We see nothing in plaintiff's conduct that was blamable or that should bar a recovery. Plaintiff offered perfectly competent proof for the purpose of showing de-

fendant's responsibility for the key being in the marshal's possession and his opening the depot for the accommodation of passengers for this night train, but defendant objected to this line of testimony and at its instance the court refused to let it be heard.   What the witness would have testified to if the court had permitted him to answer the questions, we, of course, cannot know, but the questions asked by plaintiff's counsel, to which defendant's objections were sustained, were asked, and the witness was offered for the purpose of making the very proof that defendant now claims is lacking and by reason of which it insists the judgment in this case should be reversed.   It does not lie in the mouth of defendant to object that certain proof was not made when it was prevented from being made by its own objections.   Hahl v. Brooks, 213 Ill. 134.   It cannot be permitted to take advantage of an error that it was responsible for.   Emerick v. Hileman, 177 Ill. 368; Watson Cut Stone Co. v. Small, 181 Ill. 366; C. & A. R. R. Co. v. Lewandowski, 190 Ill. 301; People v. Offerman, 84 Ill. App. 132; Martin v. Leslie, 93 Ill. App. 44; Clemson v. State Bank of Illinois, 1 Scam. 46.

We have not overlooked the fact that Pond, who was defendant's agent at the time of plaintiff's injury, testified he did not give the marshal a key and had no knowledge of his having one, and that he was plaintiff's witness.   We have read his testimony from the record.   The questions in answer to which he gave the testimony above quoted were not objected to, and after he had answered them plaintiff's counsel inquired where he had been the night before, with whom he had been and if he had not been with defendant's claim agent, to which defendant's counsel objected and the court sustained the objections.   Plaintiff's counsel then inquired of him if he had not told him that the village marshal had brought him, the agent, the key to the gent's waiting room and offered to give it up, but that witness told him to keep it.   Objection of defendant's counsel to this was sustained and plaintiff's counsel then stated to the court he was completely taken by surprise at

C. & A. R. R. Co. v. Walker.

the witness' answers, because they were contrary to what
the witness told him about the matter before he was placed
on the stand. Witness was then asked if in the conversa-
tion counsel referred to, he had said anything about the
key, to which he replied he did. He was then asked if he
did not state that the village marshal offered him the key
and said he did not want to keep it any longer, to which
he replied : "It is true and it isn't true; I didn't say that."
It will be observed that this answer is a rather peculiar
one and its meaning somewhat obscure. In the light of the
witness' apparent attitude toward the parties, it tends to
cause suspicion that the witness was trying to be evasive.
Whether the witness said to counsel the words the question
implied, may be left in doubt by the answer, but that he
had told counsel the village marshal had talked to him
about the key and of the subject-matter embraced in the
question there can be no doubt. Up to this point counsel
had not by his questions fixed the time referred to by wit-
ness in the conversation as being prior to the 8th of May.
He then asked the witness if he did not state to him, plaint-
iff's counsel, that the village marshal offered him the key
before May 8th, and about May 3rd, and that witness gave it
back to him and told him it was customary for him to have
the key and he should keep it. Objection by defendant to
this question was sustained. The witness further testified,
as we have before stated, that on at least two occasions he
saw lights in the depot after he had left it in darkness and
locked the doors; that he did not know how they came
there and made no inquiry to ascertain. Witness was also
asked if he talked to defendant's counsel about the case,
but on objections by defendant was not permitted to answer
the question. On cross-examination witness testified over
plaintiff's objections that in the forenoon of the next day
he and his wife, a woman weighing about 110 to 125 pounds
(the proof shows plaintiff weighed 167 pounds), put her heel,
or attempted to, in the hole in the floor with the toe point-
ing to the door and that the hole was not large enough for
the heel to sink in it. What kind of a heel was on his

wife's shoe he could not tell or describe except that it was
a shoe heel, nor could he say whether it was like the heel
of plaintiff's shoe.    That was the only subject touched
upon by the cross-examination.    While this witness was
introduced by the plaintiff, it is, we think, apparent from
the record, he was not friendly to that side of the case.
Plaintiff's counsel stated to the court that he was taken by
surprise because the witness had testified to a different
state of facts from what he had told him before he was
placed on the stand, and then asked a number of leading
questions about what the witness had told him.    To sub-
stantially all of these questions the court sustained objec-
tions.    If the witness was, as it appears, unfriendly to the
plaintiff, and if he had told her counsel a different story
before he was placed on the witness stand from that
told on the stand, it was within the discretion of the trial
court to have allowed counsel to ask him leading questions.
Meixsell v. Feezor, 43 Ill. App. 180; Cassem v. Galvin, 158
Ill. 30; Williams v. Jarrot, 1 Gilm. 120; Bradner on Evi-
dence, p. 28.    The trial court however, was in a better
position than we are to judge of the propriety of allowing
such an examination, and we cannot say that he should
have allowed all questions of this character to have been
answered.    We would have been better satisfied if he had
allowed some of them at least, and among the questions it
appears to us might with propriety have been answered, is
the question as to where and with whom the witness had
been the night before and after making his alleged state-
ment to plaintiff's counsel, and whether he had been with
defendant's claim agent.    The fact that he had been with
him, if such was the fact, would not of itself necessarily
have tended to discredit him, and for that reason we do
not see why defendant's counsel would object to the wit-
ness answering the question.

Believing we are justified in assuming that the village
marshal, if he had been permitted, would have testified
that he was in the habit of opening the waiting room of
the depot for the accommodation of passengers for the

night train with the knowledge and consent of defendant or its agent, and that he received from the agent and carried a key for that purpose, and considering this in connection with the fact that it was defendant's duty under the law to open its depot for passengers for that train, and the further fact that the depot was opened by a man in no way connected with plaintiff, that this man had a key to the lock on the door, that while defendant's agent was not in the habit of opening the depot for the train plaintiff intended to take he had seen lights in the building after he had closed it at night and made no investigation of it, we are of opinion it cannot be said the judgment should be reversed, because the evidence does not show defendant's knowledge of the responsibility for its depot being open.

It is insisted the evidence does not sustain plaintiff's claim that her fall was the result of the heel of her shoe catching in the hole in the floor. Plaintiff's shoe had what is called a spring heel. This, as we understand it, is a thickening of the sole under the heel without there being any heel taps tacked on, as is usual with shoes having raised heels. It is argued that a spring heel could not have sunk in the hole if plaintiff had stepped upon it at right angles, and that, as the proof shows, the width of the hole was one and seven-eighths of an inch full, and the shoe heel the same width scant, it was impossible for her to get her heel caught in the opening unless she placed her foot lengthwise of it.

Plaintiff testified she started to go out on the platform when she heard the train whistle, but stopped near the door to wait till the engine had passed on account of the cinders; that it then occurred to her she had better go out and have the children ready when the train stopped, and as she started to do so, caught the heel of her left shoe in the hole and fell out of the door upon the platform which was several inches lower than the doorsill. She emphatically denied her fall was caused by stepping from the doorsill to the platform. The testimony of her brother, who preceded her out of the waiting room, and the village marshal, who

was still in the room and behind her, tended to corroborate plaintiff's statement that the fall was not caused by stepping down off the doorsill on the platform, though neither one of them claim to have seen her heel drop into the opening or come out of it. It is not at all improbable from the evidence that plaintiff's foot may have been practically lengthwise of the opening when it caught. She says when she got near the door she stopped a moment to wait for the engine to pass and then changed her mind and started on, and the village marshal testified she " partly turned and spoke to me as she went out the door." Plaintiff further testified that after she fell there were marks on the heel that were not there before. We think the evidence fairly shows her fall was caused by her heel getting caught in the opening in the floor.

It is also argued plaintiff's injury was not so serious as she claimed, and that the damages were excessive. The testimony shows plaintiff suffered a great deal of pain. She testified it was twenty-one days after her injury before she could put her foot on the floor, and that at the end of six weeks she could not bear her weight on it. It was five months before she could walk on it with the aid of a cane. She used a cane to aid her in walking at the time of the trial, and said she experienced difficulty in getting around, and that in getting around in her house she did so with her knee on a chair much of the time. She also testified it pained her very severely if she walked much, and that she had to wear an ankle supporter or brace all the time except when in bed. The ligaments of the ankle were strained and extended, and in the opinion of medical witnesses, some of them lacerated and ruptured. The foot was also turned inward and plaintiff claimed to be unable to straighten it. Two physicians testified they considered her injuries permanent. They described the condition of the parts, the appearance of the ankle at the time of the trial, and if their testimony is to be believed, it presented an abnormal or unnatural appearance. During the trial, plaintiff, at defendant's request, permitted two surgeons

from Chicago who were in attendance as witnesses for defendant, one of them its consulting surgeon, to examine her injured ankle. They testified there were no evidences of any injury to it whatever, that it was normal in appearance, and that the turning in of the foot was, in their opinion, simulated. It was for the jury to determine what witnesses were entitled to be believed and what testimony was entitled to the greater weight and credit. Upon the question of whether plaintiff was at the time of the trial still suffering from the injury, and whether its effects were visible and probably permanent, and whether the damages are excessive, we think there is no justification for disturbing the verdict.

Complaint is made of the refusal of three instructions offered by defendant. The first was properly refused because it invaded the province of the jury. The second one told the jury if plaintiff entered the waiting room after it was unlocked by some one not authorized to do so, she could not recover. The third in a more elaborate manner stated, in substance, the same proposition. In our view of this case, these instructions were properly refused, and what we have hereinbefore said renders unnecessary any further discussion of them. Besides the court, at defendant's request, instructed the jury that if the depot was not opened by authority of defendant for the reception of passengers, and plaintiff entered the waiting room without authority or invitation or consent, expressed or implied, of defendant, she could not recover. This is substantially the proposition embraced in the refused instructions, and having been given in one, it was not error for the court to refuse to repeat it in others. The jury was very liberally instructed on behalf of defendant, and especially so as to the degree of care the defendant owed plaintiff as a passenger.

On the trial the physicians who testified for plaintiff were permitted to use the skeleton of a human foot in explaining to the jury the location of the various bones and ligaments of the ankle. This is urged as error. We can-

not see how any possible prejudice could result to defendant from such use of it, and in our judgment it was entirely proper.

It is not denied that defendant was negligent in allowing the hole in the floor to be and remain there. On this subject we think the proof shows great negligence in defendant, where great care is required by law. T., W. & W. R. W. Co. v. Grush, 67 Ill. 262. The evidence also tends to show plaintiff was herself not guilty of negligence, and while we would have been better satisfied with this case if the trial court had permitted the testimony we have said was improperly denied plaintiff, yet in view of the fact that defendant was responsible for this testimony not being heard, we believe we are justified in sustaining this judgment, and it is accordingly affirmed.

*Affirmed.*